**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**ATHENS DIVISION**

| | | |
|---|---|---|
| **PAMELA M. BAILEY-PITTMAN,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **3:04-CV-84 (CAR)** |
| | : | |
| **UNISIA OF GEORGIA CORP.,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

_____

### *ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

Before the Court is Defendant Unisia of Georgia Corporation's Motion for Summary Judgment [Doc. 38]. Plaintiff has filed a Response to Defendant's Motion [Doc. 46], and Defendant has filed a Reply to that Response. [Doc. 48]. Having considered the arguments of the parties and the relevant law, Defendant's Motion for Summary Judgment is **GRANTED**.

### BACKGROUND

Plaintiff, Pamela Bailey-Pittman ("Bailey"), is a former Line Lead in the production department of Defendant Unisia of Georgia Corporation ("Unisia"). She brings this action against Unisia complaining that Unisia refused to promote her, and ultimately terminated her, because of her race and sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. and 42 U.S.C. § 1981. Bailey also claims that while employed by Unisia, she was subjected to a racially hostile work environment. Finally, Bailey claims that Unisia was negligent in hiring and retaining Gina Cooper in the position of Human Resources Administrator, and in permitting Cooper, as the Human Resources Administrator, to perform tasks formerly performed by the Human Resources Manager after that position was eliminated.

## SUMMARY JUDGMENT STANDARD

Summary judgment must be granted if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996). Not all factual disputes render summary judgment inappropriate; only a genuine issue of material fact will defeat a properly supported motion for summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). This means that summary judgment may be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict. See id. at 249-52.

In reviewing a motion for summary judgment, the court must view the evidence and all justifiable inferences in the light most favorable to the nonmoving party, but the court may not make credibility determinations or weigh the evidence. See id. at 254-55; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law. Celotex, 477 U.S. at 323 (internal quotation marks omitted).

If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact (i.e., evidence that would support a jury verdict) or that the moving party is not

entitled to a judgment as a matter of law.  See Fed. R. Civ. P. 56(e); see also Celotex, 477 U.S. at

324-26.  This evidence must consist of more than mere conclusory allegations or legal

conclusions.  See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991).  Summary judgment

must be entered where "the nonmoving party has failed to make a sufficient showing on an

essential element of [his] case with respect to which [he] has the burden of proof."  Celotex, 477

U.S. at 323.

**FACTS**

The facts relied upon by the Court in arriving at its decision, taken in the light most

favorable to Plaintiff, are as follow:

Defendant, Unisia of Georgia Corporation, manufactures and assembles automotive parts

for several different vehicle manufacturers, such as Ford, General Motors, and Subaru, at a

facility located in Monroe, Georgia.  Unisia's production department is divided into several

different production "lines," each manufacturing a different automotive part.  Each line is

comprised of several "Operators" and one "Line Lead," who oversees the Operators.  The

Operators and Line Leads are supervised by a Supervisor.

Plaintiff, Pamela Bailey-Pittman, an African American female, began working in

Unisia's production department in 1998, when the facility opened.  Bailey initially was hired as

an Operator, but soon thereafter became a Line Lead.  Bailey was unquestionably a valuable

employee: she was one of a handful of employees selected to travel to Japan for training; she was

asked by management to help save a twenty-five million dollar contract; and she was named

"Employee of the Year" in 2002 and "Employee of the Month" in May 2003.  Bailey also

possessed a spotless record: she had never received any formal discipline such as a write-up,

written warning, or suspension, prior to her termination.

Nevertheless, Bailey was denied several promotions in August and November 2003, and then was terminated in December 2003 for allegedly violating Unisia's "Honesty" policy by lying about her qualifications on an internal application form for one of the promotions she sought.

### A.    Senior Quality Assurance Inspector

The first position for which Bailey applied, in August 2003, was that of a Senior Inspector in the Quality Assurance Department.  The Senior Inspector was responsible for supervising a team of employees that inspected finished and unfinished goods.  The Senior Inspector was also responsible for developing strategies to prevent nonconformities.

The Senior Inspector reported to the Manager of the Quality Assurance Department, Machiko Alexander, a bi-racial African and Japanese American female.  As the Manager of the Quality Assurance Department, and as the immediate supervisor over the Senior Inspector, Alexander submitted a requisition for the position and created a list of job duties.  She also developed interview questions and a scoring method for evaluating candidates.  The scoring method evaluated the applicant's internal application, attendance record, years of college, computer skills, ability to read blueprints, leadership skills, and communication skills.

Seven people applied for the job.  Six of the applicants were African-American, and one was Caucasian.  Each of the applicants interviewed with a four-person panel. Following the interviews, Christy Bruce, the only Caucasian applicant, was selected for the position.  Bruce had the highest total score of all the applicants.  Bailey had the second highest total score, falling behind Bruce only in the areas of "years of college" (Bruce had four years, while Bailey had

4

none), "ability to read blueprints" (Bruce scored a "5" out of "5" while Bailey scored a "2"), and "communication" (Bruce scored a "7" out of "7" while Bailey scored a "6").

### B.    Propeller Shaft Lead

The second position for which Bailey applied, also in August 2003, was that of Line Lead for a new production line, which was to manufacture propeller shafts for Subaru vehicles (the "Propeller Shaft Line").  Unisia sought to hire two people as Propeller Shaft Leads: one to work during the "A" shift and one to work during the "B" shift.

The "A" Shift Supervisor, Bob Armstrong, and the "B" Shift Supervisor, Scott Spratlin, would oversee the Propeller Shaft Leads during their respective shifts.  As the immediate supervisors of the Propeller Shaft Leads, Armstrong and Spratlin developed interview questions and a scoring method to evaluate candidates.  The scoring method evaluated the candidates' skills, experience, attendance, and other criteria.

Seven people applied for the job.  Six of the applicants were African American and one was Asian.  Ultimately, Michael Clayton, an African American male, and Bouyaeng Ngohnkheo, an Asian male, were selected for the "A" and "B" shift positions, respectively.  Clayton received the highest score, Bailey received the second highest, and Ngohnkheo received the third highest. Unisia claims that it offered the "B" shift position to Bailey, but she declined the offer.[1]

### C.    "A" Shift Supervisor

The third position for which Bailey applied, in November 2003, was that of "A" Shift Supervisor.  According to the job posting, a successful candidate was required to have at least four years of experience in a supervisory or managerial role.

---

[1]        It is unclear whether Bailey disputes this fact.

Two people applied for the position, Bailey and Scott Spratlin, a Caucasian male, who had been the "B" Shift Supervisor since July 1999. Both were interviewed for the position, and Spratlin was ultimately selected. Unisia claims that Spratlin's four years of experience as the "B" Shift Supervisor made him the preferred candidate for the position.

### D.    Bailey's Termination

During the selection process for the "A" Shift Supervisor position, at least one of the members of the interview panel, Gina Cooper, the Human Resources Administrator, became suspicious after reading Bailey's internal application. Specifically, Cooper noted that Bailey represented that she had held the positions of "Assistant Electronic Supervisor" at Mitsubishi and "Quality Control Supervisor" at ConAgra. Cooper testified that she found it suspicious that Bailey had not previously mentioned such positions or experience.

Cooper reported these discrepancies to Unisia's president and its general manager. Upon their direction, Cooper contacted Mitsubishi and ConAgra for additional information about Bailey's employment. An employee in ConAgra's Human Resources Department told Cooper that she did not believe that Bailey held the title or position of "supervisor." Likewise, an employee of Mitsubishi by the name of Peggy Bray told Cooper that Bailey only held the following positions at Mitsubishi: CTV Production Operator (1986-1996) and Production Center Warehouse Worker (1996-1998). Bray, however, failed to mention that she (Bray) was not a member of the Mitsubishi Human Resources Department when the factory was in operation, but instead was an hourly shipping clerk. Bray also failed to mention that Mitsubishi converted to a "team concept" model in approximately 1996, and that under this model, all supervisors were removed from their normal duties and all of those duties were assumed by team members, such

6

that each team member took a turn performing different supervisory and managerial tasks.

In addition, during Bailey's interview for the "A" Shift Supervisor position, Cooper questioned Bailey about her positions at Mitsubishi and ConAgra. Though the parties dispute how Bailey responded to these questions, the Court must view the facts in the light most favorable to Bailey. Accordingly, the Court will assume for the purposes of this motion that Bailey responded to Cooper's questions by explaining her previous duties and roles at Mitsubishi, and describing how they had been supervisory in nature. The Court will also assume, as Bailey contends, that she admitted to the interview panel that the term "assistant electronics supervisor" was a description of her job duties, not her title.

Based on this information, Unisia's President, Kenichi Kusumi, concluded that Bailey had provided false information to the company by representing that she held the positions of "assistant supervisor" and "supervisor" at Mitsubishi and ConAgra. Kusumi considered Bailey's conduct to be a violation of the company's "Honesty" policy, which is outlined in the Employee Handbook. Specifically, the "Honesty" policy states:

> "Do not falsify or fail to disclose completely all information requested or recorded on any employment, personnel, production, or other record of the Company or its supplies, customers, or insurance carriers."

After deciding that Bailey's conduct amounted to a violation of this policy, Kusumi terminated Bailey on December 1, 2003.

Three days later, on December 4, 2003, Ken Ott, Bailey's former supervisor at Mitsubishi contacted Unisia, and attempted to explain why Bailey's use of the title "supervisor" was not inaccurate in light of the "team concept" model Mitsubishi employed. Ott also asked the company to reconsider its decision and allow Bailey to return to her job. Unisia did not.

7

E.      **Hostile Work Environment**

Bailey also argues that during her five years of employment at Unisia, she was subjected to a racially hostile work environment.  Bailey points to two incidents that she claims were racially-motivated.  First, Bailey claims that a white female line operator, Beverly Casper, made the comment, "Ain't enough D-A-M [sic] room out here for all these folks.  Too many D-A-M flies at this picnic."  Bailey explained that she interpreted this comment as race-based because, "[t]o me, being an African American, I am Black; a fly is black."  Immediately after Casper made this comment, Christy Bruce and Bailey reported the incident to management.  Management then called a group meeting, and everyone was told to get along.

The second racially-motivated incident occurred when Bailey discovered a rope in the shape of a noose lying across a machine.[2]  Bailey, along with three co-workers, reported the presence of the noose to a manager, and the manager immediately got rid of it.

## DISCUSSION

I.      **Title VII Claims**

Bailey claims discrimination under two distinct theories: disparate treatment discrimination and disparate impact discrimination.  The first theory requires Bailey to prove that Unisia acted with discriminatory intent; the second does not.  Cooper v. Southern Co., 390 F.3d 695, 723 (11th Cir. 2004).

As a preliminary matter, the Court notes that it need not address Bailey's disparate impact claim.  The claim was not asserted in her sixteen-count, two hundred forty three-paragraph Complaint [Doc. 1], but was raised for the first time in her Response to Defendant's

---

[2]      There is some evidence in the record to suggest that the "noose" was nothing more than a rope with a knot in it, and that it looked like a noose because of the way it was lying on the machine.

Motion for Summary Judgment.  By failing to allege a disparate impact theory of discrimination in her Complaint, Bailey failed to put Unisia on notice of the specific charges levied against it, and failed to afford Unisia the opportunity to defend itself against such charges.  Because Bailey failed to assert this claim in her Complaint, the Court need not consider it here, on summary judgment.  See Cooper, 390 F.3d at 732.  Bailey's disparate impact claim, therefore, must be dismissed.  Id. ("Any claims not asserted in the plaintiff's Complaint are properly dismissed.").

With respect to Bailey's disparate treatment claims, Bailey bears the burden of proving that Unisia  intentionally discriminated against her on the basis of her race or sex.  Id.  Bailey can establish discriminatory intent either through the introduction of direct evidence of discrimination or through circumstantial evidence that creates an inference of discrimination.  Id. In this case, the parties do not dispute that Bailey's claims of race and sex discrimination are based on circumstantial evidence.  Therefore, the claims will be analyzed under the burden-shifting framework detailed in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1972). Because Bailey has also analyzed her claims under the Price Waterhouse "mixed motives" test, the Court will analyze her claims under both frameworks.

A.     **McDonnell Douglas framework**

Under the McDonnell Douglas framework, an employee must first demonstrate a prima facie case of discrimination.  Id. at 802.  If the employee establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action.  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981).  Once the employer provides a legitimate, nondiscriminatory reason for its action, the employee's prima facie case is rebutted.  Id. at 253.  The employee  must then show that the employer's proffered

reasons for its actions were not the real reasons that motivated its conduct, but rather, the employer's proffered reasons were merely pretext for discrimination.  Id.

### 1.     Failure to Promote

Bailey claims that she was denied three promotions because of her race and sex.  To establish a prima facie case of race and sex discrimination in a promotional decision, a plaintiff must prove: (1) that she was a member of a protected class; (2) that she was qualified and applied for the promotion; (3) that she was rejected despite those qualifications; and (4) other equally or less qualified employees who are not members of the protected minority were promoted. Lee v. GTE Fla., Inc., 226 F.3d 1249, 1253 (11th Cir. 2000).  If Bailey establishes a prima facie case of discrimination, the burden shifts to Unisia to articulate a legitimate, nondiscriminatory reason for rejecting her.  Id.  If Unisia satisfies this burden of production, Bailey must then establish that Unisia's proffered reasons for rejecting her were pretextual.

In this case, Bailey claims that she was passed over for three promotions: a promotion to the position of Senior Inspector in the Quality Assurance Department; one to the position of Propeller Shaft Lead; and one to the position of "A" Shift Supervisor.

### a.     Senior Quality Assurance Inspector

With respect to the Senior Quality Assurance Inspector position, Unisia argues that even if Bailey can establish a prima facie case, it had a legitimate, nondiscriminatory reason for choosing Christy Bruce, a Caucasian female, over Plaintiff.  Specifically, Bruce had considerably more education than Bailey, having nearly completed a four-year business administration degree, and achieved higher scores on communication and blueprint skills than Bailey.  Because reading and understanding blueprints appears to have been an integral part of

the Senior Inspector's job, which involved inspecting various finished and unfinished automotive parts to ensure conformity, Unisia's preference of a candidate with strong blueprint skills certainly is understandable.

Unisia further argues that Bailey cannot produce evidence to create a genuine issue of material fact as to whether Unisia's reasons were pretextual. Bailey's only evidence of pretext appears to be that she scored higher than Bruce on several of the objective and subjective portions of the selection process.

This evidence, however, is insufficient to create a genuine issue of fact as to whether Unisia's proffered reasons are pretextual. The evidence that Bailey scored higher in certain categories of the applicant evaluation amounts to nothing more than an allegation that Bailey was more qualified than Bruce. In a failure to promote case, an employee may not establish pretext simply by showing that she is more qualified than the person who is awarded the position. Cooper v. Southern Co., 390 F.3d 695, 743 (11th Cir. 2004). Rather, because federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions," id. at 738 (quoting Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991)), the "disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." Id. at 743; Lee, 226 F.3d at 1254. Bailey, therefore, was required to produce evidence that she was "so clearly more qualified for the position than [Bruce] that a reasonable juror could infer discriminatory intent from the comparison." Cooper, 390 F.3d at 743. This she did not do. While the fact that Bailey scored higher than Bruce on several portions of the applicant evaluation suggests that she was a strong

contender for the position, her scores do not suggest that she was so much more qualified for the position than Bruce that no reasonable person in the exercise of impartial judgment would have chosen her over Bruce.  Furthermore, to the extent that Bailey contests the interview panel's use of subjective criteria in the selection process, this practice is permissible. See Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1088 (11th Cir. 2004) ("[A]n employer's use of subjective factors in making hiring or promotion decisions does not raise a red-flag.").

**b.     Propellor Shaft Lead**

With respect to the Propellor Shaft Lead position, Unisia first argues that Bailey cannot make out a prima facie case because Bailey was offered, and declined, the position.  It is unclear whether Bailey disputes this fact; however, even if Bailey does dispute this fact and can make out a prima facie case of discrimination, the Court finds that Bailey cannot establish pretext.

The two candidates selected for the positions were Michael Clayton, an African American male, and Bouyaeng Ngohnkheo, an Asian male.  To establish pretext, therefore, Bailey must offer evidence showing that the interview panel was motivated by sex in selecting Clayton and Ngohnkheo instead of her.  See Lee, 226 F.3d at 1253.  Bailey has offered no evidence to suggest that the interview panel or other decisionmakers in the selection process were motivated by sex or influenced by gender bias in filling the position.  Instead, Bailey argues that the method of evaluating the candidates was discriminatory because the scores were based "on the evaluator's personal observations," rather than on objective criteria.  Bailey also argues that the selection process was discriminatory because she was not interviewed, while other candidates were.

Neither piece of evidence establishes that Unisia's proffered reasons for choosing Clayton

and Ngohnkheo are pretext for sex discrimination.  As discussed above, Unisia was entitled to use legitimate, job-related subjective criteria in its selection process, as long as it applied such criteria in a non-discriminatory manner.  <u>Wilson</u>, 376 F.3d at 1088.  Bailey has produced no evidence from which a reasonable juror could find that the interview panel scored the candidates in a discriminatory manner.  In fact, the scoring chart produced by Bailey shows that Bailey and many of the other female applicants were scored the same as, or better than, some of the male applicants.  Likewise, the fact that Bailey was not interviewed does not establish pretext.  Bailey still was considered for the Propeller Shaft Lead position and received scores (quite good scores, in fact).

      **c.**      **"A" Shift Supervisor**

Finally, with respect to the "A" Shift Supervisor position, Unisia argues that Bailey cannot make out a prima facie case of discrimination because she was not qualified for the position.  The job posting for the position specifically stated that "at least 4 years of experience in a supervisor/managerial role" was required.  Bailey failed to meet this requirement because she never occupied a supervisory or managerial position.  Though Bailey argues that she did, in fact, act as a supervisor at ConAgra and Mitsubishi, she does not dispute that she never held the title of "Supervisor" at either company.

Because Bailey has failed to demonstrate that she met the posted qualifications for the "A" Shift Supervisor position, she cannot establish a prima facie case of failure to promote with respect to this position.  This failure to promote claim, therefore, fails under the <u>McDonnell Douglas</u> framework.

      **2.**      **Termination**

Under the McDonnell Douglas framework, in a case involving a plaintiff's termination, the plaintiff may establish a prima facie case by showing: (1) she belongs to a protected class; (2) she was terminated from a position for which she was qualified; and (3) other, similarly situated non-minority employees were treated more favorably.  Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1310-11 & n.6 (11th Cir. 1998).

For the purposes of the present motion, there is no dispute that Bailey can establish that first two elements of a prima facie case.  She is a member of a protected class as an African-American woman, and she suffered an adverse employment action when she was terminated.  Furthermore, Unisia has not challenged whether Bailey was qualified for the position she held at the time of her termination.  Thus, the issue raised by the present motion with respect to Bailey's termination claim is whether Bailey can point to sufficient evidence showing that a similarly situated, non-minority employee was treated more favorably than she.

For an employee to be "similarly situated," the employee must be similarly situated in all relevant respects.  Jones, 137 F.3d at 1311.  The most important factors to consider in determining whether an employee is similarly situated are the nature of the offenses committed and the nature of the punishments imposed.  Maynard v. Bd. of Regents, 392 F.3d 1281, 1289 (11th Cir. 2003).  The Eleventh Circuit requires that "the quantity and quality of the comparator's misconduct be nearly identical to prevent courts from second-guessing the employers' reasonable decisions and confusing apples with oranges."  Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999).  Exact correlation is not necessary, but the cases must be fair congeners. Id. (quoting in a parenthetical Dartmouth Review v. Dartmouth Coll., 889 F.2d 13, 19 (1st Cir. 1989).

14

Bailey and Unisia agree that prior to Bailey's termination, no other employee had violated Unisia's "Honesty" policy.  Bailey, however, points to a number of other employees at Unisia who violated certain company policies with impunity.

First, Bailey points to Jeffrey Logan, a Caucasian male, as a possible comparator.  Bailey argues that Logan left a rope lying on a machine in a workroom, which was tied as, or at least looked like, a noose.  Management investigated the incident, but did not punish Logan.

Second, Bailey points to Beverly Casper, a Caucasian female, as a possible comparator. Bailey argues that Casper made a racist comment to her when Casper said, "there are too many D-A-M [sic] flies at this picnic."  Following the comment, Casper handed car parts to Bailey in a physically threatening, hostile manner.  Baily argues that Casper's conduct violated Unisia's policy against violence and threats in the workplace.  And, while management held a group meeting with Casper and other Operators to discuss Casper's behavior, Casper was not, herself, written up or otherwise formally disciplined.

Third, Bailey points to Scott Spratlin, a Caucasian male.  Bailey argues that Spratlin violated Unisia's policy prohibiting employees from holding a second job that interferes with their responsibilities at Unisia.  Bailey argues that Spratlin held a second job at Sears in violation of this policy, but was not disciplined.

Fourth, Bailey points to Bryan Stinocher, a Caucasian male, and his wife, Miwako Stinocher, a Japanese American female.  Bailey claims that the Stinochers violated Unisia's policy prohibiting the employment of family members in the same department.  Bryan was a General Manager, who reported directly to Unisia's president, while Miwako was the president's secretary and translator.  Neither was punished for violating this policy.

15

Finally, Bailey points to Bob Armstrong, a Caucasian male, who allegedly told a potential applicant about a job before it was posted.  Bailey argues that this violated an informal policy prohibiting managers from telling employees about jobs before they were posted.  It is questionable, however, whether this was an actual "policy."[3]

None of Bailey's comparators is sufficiently similarly situated to Bailey for the purpose of a Title VII analysis.  The offenses committed by the comparators are less serious than that committed by Bailey.  Furthermore, while both the comparators' offenses and the offense committed by Bailey may have been subject to Unisia's progressive punishment, "it is insufficient to characterize misconduct as 'similar' simply because it may result in the same or similar punishment."  Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1312 (11th Cir. 1998).  Like the offenses at issue in Jones, the comparator offenses at issue in this case "involve too many variables that preclude their use as comparators with ["Honesty" policy violations]."  Furthermore, Unisia was entitled to treat Bailey's violation of the "Honesty" policy as more severe than a violation of its other policies.  Id. at 1311-12 ("Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules.").  Title VII permits such a practice, as long as the practice is followed in a nondiscriminatory manner.  Id. at 1312.  There is no evidence in the record to suggest that Unisia investigated policy violations or doled out punishments for such violations in a discriminatory manner.

---

[3]    Bailey appears to mischaracterize Gina Cooper's testimony on this subject.  During Cooper's deposition, Plaintiff's counsel asked Cooper, "Is it a policy not to tell about a job before you're supposed to?"  Cooper answered, "Yeah, I mean I would not.  Everyone should find out at the same time.  Of course, whoever put in the request, they know."  Cooper's answer does not suggest that Unisia somehow had an informal policy on the subject, or that the violation of such a "policy" would result in discipline.

Because Bailey has failed to demonstrate that similarly situated, non-minority employees were treated more favorably, she has not met her burden of establishing a prima facie case.  Her Title VII termination claim, therefore, fails under the <u>McDonnell Douglas</u> burden-shifting framework.

### B.    <u>Price Waterhouse</u> "Mixed Motives" Test

Having determined that Bailey's failure to promote and termination claims fail under the <u>McDonnell Douglas</u> framework, the Court will now consider these claims under the <u>Price Waterhouse</u> "mixed motives" framework.  Under the <u>Price Waterhouse</u> framework, a plaintiff must prove by a preponderance of the evidence that an illegitimate factor played a motivating role in the employment decision.  <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90, 99-100, 123 S.Ct. 2148, 2154, 156 L.Ed.2d 84 (2003).  The plaintiff may do so either through direct or circumstantial evidence.  <u>Id.</u>  Once a plaintiff has established that an illegitimate factor played a motivating role, a defendant can " 'avoid liability only by proving that it would have made the same decision even if it had not allowed [the illegitimate factor] to play such a role.' "  <u>Brown v.Walt Disney World Co.</u>, 805 F. Supp. 1554, 1561 (M.D. Fla. 1992) (quoting <u>Price Waterhouse v.Hopkins</u>, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)).

Bailey's race and gender discrimination claims also fail under the <u>Price Waterhouse</u> "mixed motives" test because there no evidence in the record from which a reasonable jury could determine that Bailey's race and gender was "impermissibly thrown into the mix of factors" that Unisia considered when deciding to promote others instead of her, and when deciding to terminate her. <u>Brown</u>, 805 F.3d at 1564.

The only evidence that Bailey points to as evidence that her race was a motivating factor

in Unisia's decision to award the three promotions to others instead of to her is the fact that she was well-qualified for each of the three positions.  Likewise, the only evidence Bailey points to with respect to her termination claim is the odd circumstances of her termination.  Bailey was a valuable employee with a spotless disciplinary record, but was terminated for "fudging" an internal job application.  Absent other evidence of racial and sexual animus, the fact that Bailey was passed over for thee promotions, and was terminated, despite being a valuable employee, for what she perceived to be a "minor offense," does not support the inference that her race and gender were motivating factors in those decisions.  Cf. id. (finding sufficient evidence to support a finding of "mixed motives" when supervisors repeatedly used racial epithets when referring to the plaintiff; failed to investigate thoroughly her allegations of mistreatment; and failed to promote her, while promoting substantially less qualified non-minority employees).  Though it is unfortunate that Unisia terminated such a valuable employee, it is not the place of this Court to second-guess the wisdom of Unisia's decision.  See Cooper v. Southern Co., 390 F.3d 695, 738 (11th Cir. 2004) (Federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions.").  Rather, this Court's role is limited to determining whether an employer's decisions were motivated by a discriminatory animus, and, in this case, the Court has found that Unisia's were not.  See Lee v. GTE Fla., Inc., 226 F.3d 1249, 1253 (11th Cir. 2000) (quoting Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 1999) in a parenthetical for the proposition that courts "are not in the business of adjudging whether employment decisions are prudent or fair.  Instead [their] sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.").

Because Bailey has failed to show that her race and gender were motivating factors in

Unisia's employment decisions, her failure to promote and termination claims likewise fail under the Price Waterhouse "mixed motives" analysis.

### C. Hostile Work Environment

Bailey also claims that while employed by Unisia, she was subjected to a racially hostile work environment.  A hostile work environment claim under Title VII is established upon proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993)).  To establish a hostile work environment claim, Bailey must show: (1) that she belongs to a protected group; (2) she has been subject to unwelcome harassment; (3) the harassment was based on a protected characteristic of the employee; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for such an environment under either a theory of vicarious or direct liability. Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).

Bailey's hostile work environment claim fails because she cannot show that the harassment was so severe or pervasive that it created a discriminatorily hostile working environment.  See  Welch v. Delta Airlines, Inc., 978 F. Supp. 1133, 1138 (N.D. Ga. 1997) (a plaintiff must show that the working conditions resulted in "an atmosphere so permeated with discriminatory insult, ridicule, and intimidation such that an objective person would find [the atmosphere] hostile or abusive.")  Bailey's claim is based on two isolated incidents, both of

which had a questionable racial basis.  See Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999) (noting that courts should look to the "frequency of the discriminatory conduct[,] its severity[, and] whether the conduct is physically threatening or humiliating" in analyzing a hostile work environment claim).  There is nothing in the record that would lead a reasonable juror to find that either incident had any racial connotation.  Furthermore, neither of these incidents rises to the level of being so severe as to create a discriminatorily abusive working environment.  Bailey's hostile work environment claim, therefore, fails.

**II.      § 1981 Claims**

In addition to seeking damages under Title VII, Bailey seeks relief under § 1981.  This claim, however, also fails.  Section 1981 claims are also analyzed under the McDonnell Douglas framework.  Sledge v. Goodyear Dunlop Tires N. Am., Ltd., 275 F.3d 1014 (11th Cir. 2001). Because Bailey has failed to establish the existence of a genuine issue of material fact on her Title VII claims, her § 1981 claim arising from the same alleged conduct likewise does not survive summary judgment.

**III.    Negligent Hiring and Retention Claims**

Finally, Defendant seeks summary judgment on Bailey's negligent hiring and negligent retention claims.  Bailey's negligent hiring and retention claims are based on the fact that Unisia hired and retained Gina Cooper as a Human Resources Administrator, and permitted her to act as in the capacity of the Human Resources Manager when Unisia eliminated the position, even though Cooper had no previous work experience as a Human Resources Manager, and even though, in Bailey's opinion, Cooper was not qualified to perform the tasks associated with that position.  Bailey argues that "in this position of influence, [Cooper] effected discriminatory

outcomes."

Under Georgia Law, a plaintiff may state a claim for negligent hiring by showing that "the employer knew or should have known that the employee was not suited for the particular employment."  Brooks v. H.J. Russell & Co., 66 F. Supp. 2d 1349, 1355 (N.D. Ga. 1999). Likewise, a plaintiff may state a claim for negligent retention, by showing "that the employer, in the exercise of reasonable case, should have known of the employee's [propensity for misconduct] and that it was foreseeable that the employee would engage in [such misconduct]." Cox v. Brazo, 165 Ga. App. 888, 889, 303 S.E.2d 71, 73 (Ct. App. 1983).

As a preliminary matter, the Court notes that Bailey mischaracterizes Cooper's work experience.  Cooper's deposition testimony shows that before working for Unisia, Cooper had held various positions with Human Resources-related duties.  She had experience in recruitment, performing reference checks, screening applications, and performing payroll duties.  From Cooper's testimony, it is clear that she was qualified to serve as Unisia's Human Resources Administrator and to perform some of the tasks formerly performed by the Human Resources Manager.

Furthermore, even assuming that Cooper was not qualified to perform the tasks formerly performed by the Human Resources Manager, and even assuming that she performed these tasks in a racially discriminatory manner,[4] there is no evidence in the record to suggest that Unisia knew or should have known of Cooper's propensity to discriminate.  Because Bailey has provided no such evidence to support her negligent hiring and retention claims, Unisia is entitled to summary judgment on those claims.

---

[4]     As discussed above, there is no evidence of this in the record.

**CONCLUSION**

For the foregoing reasons, Defendant's Motion for Summary Judgment is **GRANTED**.

This 31st day of March, 2006.

s/ C. Ashley Royal
C. ASHLEY ROYAL
UNITED STATES DISTRICT JUDGE

AEG/chw